IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MOISE JEROME | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA HOUSING AUTHORITY, | : | |
| et al. | : | NO. 19-272 |

MEMORANDUM

Bartle, J.                                          January 13, 2020

Plaintiff Moise Jerome ("Jerome") brings this action
against defendants the Philadelphia Housing Authority ("PHA"),
PHA Police Chief Joseph Marker ("Marker"), and several John and
Jane Doe defendants alleging racial and gender discrimination
and retaliation in violation of Title VII of the Civil Rights
Act of 1964, 42 U.S.C. §§ 2000e et seq., the Pennsylvania Human
Relations Act, 43 Pa. Stat. §§ 951 et seq., and the Philadelphia
Fair Practices Ordinance, Phila. Code §§ 9-1100 et seq.  Jerome
also brings claims for deprivation of his equal protection and
procedural due process rights under the Fourteenth Amendment to
the United States Constitution pursuant to 42 U.S.C. §§ 1981 and
1983 and for retaliation and deprivation of his rights to free
speech and association under the First and Fourteenth Amendments
pursuant to 42 U.S.C. § 1983.

Before the court is the motion of defendants for
summary judgment under Rule 56 of the Federal Rules of Civil
Procedure.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). We view the facts and draw all inferences in favor of the nonmoving party. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the nonmovant. See Anderson, 477 U.S. at 252. "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Id. In addition, Rule 56(e)(2) provides "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

The following facts are undisputed. PHA is the nation's fourth largest public housing authority, owning more than 14,000 housing units and serving nearly 80,000 Philadelphians. It maintains its own police department. Jerome was hired by PHA as a police officer on April 21, 2017 and was sworn in on July 5, 2017. Defendant Marker was named as Acting Chief of the PHA Police on June 14, 2017 following the resignation of Chief Branville Bard.

During the relevant time frame, PHA had in effect PHA Police Department ("PHA-PD") Directive 41, "Vehicular Pursuits," which provides in pertinent part:

1. An officer is justified in initiating a vehicular pursuant only when he/she is:

   a. In close proximity to a suspect vehicle and believes as pursuit is necessary to prevent the death or serious bodily injury of another person, or

   b. In close proximity to a suspect vehicle and believes BOTH:

      1) The pursuit is necessary to effect the arrest or prevent escape, <u>AND</u>

      2) The officer has <u>probable cause</u> to believe that the person being pursued has committed or attempted a forcible felony OR, has <u>probable cause</u> to believe that the person being pursued possesses a deadly weapon, other than the vehicle itself.

> 2. In all other circumstances initiating a
>    vehicular pursuit is strictly prohibited.
>    Accordingly, initiating a pursuit solely
>    for stolen vehicles and traffic
>    violations, including Driving Under the
>    Influence (DUI), is strictly prohibited.

The policy defines a vehicular pursuit as "[t]he use of a motor vehicle to chase, follow, or go after a vehicle that has refused to stop." Directive 41 further provides that officers must notify PHA-PD via radio of a pursuit. It also states that "all sworn personnel involved in a pursuit in any manner" will complete and submit within three days a "Pursuit Memorandum," the form for which is attached as Exhibit A to the Directive. In addition to the PHA-PD Pursuit Memorandum, an officer involved in a pursuit must submit to the Philadelphia Police Department ("PPD") an incident report known as a "75-48" and also must provide to the Pennsylvania State Police a "Pennsylvania Police Pursuit Report." Jerome received a copy of Directive 41 and signed a written acknowledgment of his receipt on July 11, 2017.[1]

---

1.  Pennsylvania law requires that police departments including PHA-PD maintain such policies. See 75 Pa. Cons. Stat. Ann. § 6342. Pennsylvania statute defines "[m]otor vehicle pursuit" as "[a]n active attempt by a police officer operating a motor vehicle to apprehend one or more occupants of a motor vehicle when the driver of the vehicle is resisting the apprehension by maintaining or increasing his speed or by ignoring the police officer's audible or visual signal to stop." Id. § 6341. It further provides that "[e]ach police department shall develop and implement a written emergency vehicle response policy governing the procedures under which a police officer should

-4-

The PHA-PD also maintains a Disciplinary Code that regulates the conduct of PHA-PD officers and other employees. Article I of the Disciplinary Code identifies various conduct that is unbecoming of a PHA-PD employee, including "[k]nowingly and willfully making a false entry in any Department record or report." Article V delineates conduct that constitutes neglect of duty, including "[f]ailure to make required written report" and "[f]ailure to comply with any Chief of Police's orders, directive, memorand[a], or regulation; or any oral or written orders of superiors." The Disciplinary Code in Article VII also describes conduct that constitutes motor vehicle violations including the "[f]ailure to follow Departmental procedures involving pursuit and/or emergency driving." Under the Code, the PHA Chief of Police and Human Resources are permitted to impose discipline up to and including termination for disciplinary violations.

During his employment, Jerome was a member of a union, the Fraternal Order of Housing Police. The union and the PHA had a collective bargaining agreement ("CBA") in place during Jerome's employment. The CBA provides that except in the case of counseling and verbal warnings, an employee and the union shall be provided with written notice of intended discipline,

_____

initiate, continue and terminate a motor vehicle pursuit" and sets out guidelines for such pursuit policies. Id. § 6342.

including the offense alleged, the type and duration of the discipline, and the intended effective date of the discipline. In situations where the intended discipline is discharge, the employee shall receive a ten-day suspension with notice of the intent to discharge.  The employee has an opportunity to file a grievance and have a hearing.  The discharge does not become effective until the grievance procedure is completed or the parties otherwise resolve the matter.

On July 13, 2017, Jerome was assigned to a patrol vehicle with PHA-PD officer Shania Baylis ("Baylis").  Baylis acted as the driver while Jerome was the recorder, that is, he was responsible for paperwork during the patrol.  At approximately 1:28 p.m., Jerome and Baylis were sitting in their patrol vehicle at 55th and Vine Streets in Philadelphia when they witnessed a blue Jeep Cherokee run a stop sign.  Baylis activated the patrol vehicle's lights and siren but the Cherokee did not stop.  Baylis and Jerome proceeded to follow the Cherokee in their patrol vehicle to 53rd and Market Streets, where the Cherokee collided with two other cars.  After the collision, the driver of the Cherokee exited the vehicle and started running.  Jerome chased the driver on foot to 50th and Arch Streets, where he was apprehended.  Neither Jerome nor Baylis notified PHA-PD via radio of the pursuit.

Thereafter, Jerome returned to the scene of the accident where Baylis instructed him to complete a 75-48 Incident Report, which, as stated above, is a paper form used by the PPD as well as the PHA-PD. Plaintiff initially wrote the following on what he describes as a "rough draft" of the 75-48 Incident Report:

> On 7/13/17 P/O Baylis #2081 and P/O Jerome #2111 was [sic] working in a marked vehicle reading 9610 working west division. At approximately 1:29 p.m. Officer Baylis and P/O Jerome was [sic] parked at 55th Vine intersection facing north when they spotted a blue Jeep Cherokee disregard a stop sign heading eastbound on Vine from 55th Street. As police activated her emergency lights and sirens in attempt to do a vehicle stop the operator of the Blue Jeep continued on driving Eastbound on Vine while making a sharp turn onto 54th Street heading South Bound from Vine Street. Both police officers went over City Radio and PHA Radio to advise them of the situation. Police lost sight of the vehicle on 54th Street going south from Vine Street. Police surveyed for the vehicle to keep city Radio advised of the Reckless driving. . . .

Baylis then reviewed the 75-48 Incident Report and advised Jerome that it was too long. Jerome placed the draft in his book bag and started a second 75-48. On this second 75-48 Incident Report, Jerome wrote:

> <u>Pursuit</u> – on above date and time and location P/O attempted to stop Below off[ender] because of a traffic violation off[ender] Refused to stop his MV P/O was able to keep off[ender] MV in site [sic]. Offender was observed By P/O running a stop

light and subsequently crashed into two other MV.

Jerome and Baylis's supervisor that day was Sergeant Jerome Darby ("Darby"). Darby was called to the scene of the accident where he spoke to PPD officers and learned that the incident was being coded as a vehicle pursuit by the PPD. Accordingly, he advised Jerome and Baylis that a PHA-PD Pursuit Memorandum was required. However, Darby never followed up to determine if either officer completed the Pursuit Memorandum. Darby appears to have submitted a memorandum describing the incident as a "vehicle stop" and "arrest." Darby's version of the events states that Baylis and Jerome lost sight of the Cherokee and that the driver of the Cherokee was apprehended "[a]fter a short foot pursuit." He did not mention any vehicle pursuit by Jerome and Baylis.

Jerome delivered a paper copy of the 75-48 Incident Report to the PPD. Jerome concedes he did not complete a PHA-PD Pursuit Memorandum as required under Directive 41. Baylis was told to complete a PHA-PD Pursuit Memorandum but also did not do so. Baylis resigned her employment with PHA on December 17, 2017.

On or about May 31, 2018, the driver of the car that was hit by the driver of the Cherokee pursued by Baylis and Jerome filed a personal injury lawsuit against PHA, Jerome,

-8-

Baylis and others in the Court of Common Pleas of Philadelphia County.[2]  Upon learning of the lawsuit, Marker requested that PHA's Office of Audit and Compliance ("OAC") conduct an investigation regarding the incident.

As part of the investigation, OAC interviewed Jerome as well as Baylis, Sergeant Darby, who was their supervisor on duty that day, Lieutenant Hakim Dunbar ("Dunbar"), the Lieutenant on duty that day, and several other PHA-PD officers. When asked by the OAC investigators why he was being interviewed, Jerome replied "I guess that pursuit that happened about, almost a year ago, July 13th."  He further admitted that on that day he and Baylis observed a blue Cherokee run a stop sign, they had activated the siren and lights of their patrol vehicle in an attempt to stop the fleeing car, the car had not stopped, and they had followed the car.  He also stated that they had temporarily lost sight of the Cherokee but later found the Cherokee on 53rd Street backing up.  Jerome was then shown the 75-48 Incident Report he had submitted to the PPD, which stated that the officers were able to keep the vehicle in sight. In response, Jerome produced from his bookbag the first 75-48 Incident Report that he had drafted but not submitted, which noted that the officers had lost sight of the vehicle.

2.  That action was removed to this court but has since been remanded back to the Court of Common Pleas.  See Price v. Grant, No. 18-2311 (E.D. Pa.).

The OAC completed its investigation on August 7, 2018. It found that Baylis and Jerome engaged in a vehicular pursuit after observing the Cherokee commit a traffic violation by running a stop sign and that the officers failed to complete the paperwork required for vehicular pursuits, in contravention of Directive 41. It further concluded that Sergeant Darby was aware of the pursuit but failed to follow up with the officers to ensure that the paperwork was completed and failed to notify his immediate supervisor, Lieutenant Dunbar, that the pursuit had occurred.

On September 19, 2018, Antoinette Eberhart ("Eberhart"), the Deputy Chief of PHA-PD, requested that Jerome be charged with the following violations of the PHA-PD Disciplinary Code: (1) Article I, Conduct Unbecoming, for "[k]nowingly and willfully making a false entry in any Department record or report"; (2) Article V, Neglect of Duty, for "[f]ailure to comply with any Chief of Police's orders, directive, memorand[a], or regulation"; and (3) Article V, Neglect of Duty, "[f]ailure to make required written report." Eberhart recommended that Jerome be suspended immediately with the intent to dismiss. Sergeant Darby was suspended for ten days for his failure to supervise Baylis and Jerome.

On September 22, 2018, while the request for discipline was pending, Jerome was placed on restricted duty.

Jerome was notified of the discipline both in a written
"Notification of Restricted Duty and Pending Disciplinary
Action" and in a meeting at which his union representative was
present.  The Notification listed the specific provisions of the
PHA-PD Disciplinary Code that Jerome had allegedly violated and
further noted that Jerome had been given the opportunity to ask
questions but had declined to do so.  Jerome signed an
acknowledgment that he had received the Notification.

On September 28, 2018, Jerome was presented with a
"Notice of Suspension" which again notified him that he was
being suspended with the intent to discharge for the violations
of PHA-PD Disciplinary Code cited by Eberhart, as well as
Article VII, Motor Vehicle Violations, for "[f]ailure to follow
departmental procedures involving pursuit and/or emergency
driving."  The Notice was read to Jerome at a meeting with his
union representative as well as Eberhart and PHA-PD Inspector
William Britt.  Jerome was offered the opportunity to speak and
to ask questions but declined to do so.

Thereafter, Jerome's union filed a grievance
challenging his discipline.  A grievance hearing was held on
October 11, 2018.  Jerome attended the hearing but did not speak
based on the advice of his union representative.  The grievance
was denied and Jerome's termination was upheld.  Jerome was
terminated on October 31, 2018.  Jerome received from PHA a

"Termination of Employment" letter again informing him of the

specific provisions of the PHA-PD Disciplinary Code he had been

found to have violated as well as the factual basis for his

termination.  He currently is scheduled to arbitrate his

termination in February 2020.

### III

We begin with Jerome's claim for gender and racial

discrimination under Title VII, the PHRA, and the Philadelphia

Fair Practices Ordinance in Counts II, VI, and VII of the

complaint.  Specifically, Jerome asserts that he was suspended

and then terminated by PHA due to his gender and race.  Title

VII provides in relevant part:

> It shall be an unlawful employment practice
> for an employer . . . to fail or refuse to
> hire or to discharge any individual, or
> otherwise to discriminate against any
> individual with respect to his compensation,
> terms, conditions, or privileges of
> employment, because of such individual's
> race, color, religion, sex, or national
> origin.

42 U.S.C. § 2000e-2(a)(1).

To defeat summary judgment on his claims for

discrimination on this basis of gender and race, Jerome must

satisfy the three-step burden-shifting inquiry laid out in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).[3]

_____

3.  We analyze Jerome's claims under Title VII, the PHRA, and
the Philadelphia Fair Practices Ordinance in an identical

He must first produce evidence of the following to make out his prima facie case: (1) he is a member of a protected class; (2) he was qualified for the position of patrol officer; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. See Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citing McDonnell Douglas Corp., 411 U.S. at 802). Throughout the analysis, "[t]he central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin." Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003) (internal quotations and citation omitted).

If Jerome succeeds in making out a prima facie case, the burden of production then shifts to defendants to come forward with a legitimate, nondiscriminatory reason for Jerome's termination. See Makky, 541 F.3d at 214; Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 (3d Cir. 2006). If defendants are able to provide such a reason, the burden of production shifts back to Jerome to produce evidence that the proffered reason is merely a pretext for actual discrimination. See Fuentes v. Perskie, 32 F.3d 759, 763-64 (3d Cir. 1994)

---

manner. See, e.g., Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 n.5 (3d Cir. 2006); Vandegrift v. City of Phila., 228 F. Supp. 3d 464, 486 n.206 (E.D. Pa. 2017).

(citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11
(1993)).  At all times the ultimate burden of persuasion rests
with the plaintiff, Jerome.  See id. at 763 (citing Texas Dep't
of Comm. Affairs v. Burdine, 450 U.S. at 253, 254, 256 (1981)).

There is no dispute that Jerome is a member of a
protected class, that he was qualified for the position of
patrol officer, and that his termination constituted an adverse
employment action.  Thus, we will focus our inquiry on the
fourth prong of the prima facie case, that is, whether Jerome's
termination occurred under circumstances that could give rise to
an inference of intentional discrimination on the basis of
gender and race.

After reviewing the record, we conclude that Jerome
has produced no evidence that his termination occurred under
circumstances that could give rise to an inference of gender
discrimination.  Jerome has put forth two female PHA-PD officers
who he asserts were similarly situated but received more
favorable treatment:  (1) Baylis, his partner at the time of the
pursuit; and (2) PHA-PD officer A'Tia Brooks ("Brooks").  An
inference of discrimination may be drawn from evidence that a
similarly situated employee outside the protected class was
treated more favorably.  Simpson v. Kay Jewelers, 142 F.3d 639,
645 (3d Cir. 1998).  "While 'similarly-situated' does not
necessarily mean identically situated, the plaintiff must

nevertheless be similar in 'all relevant respects.'" Collins v.

Kimberly-Clark Pa., LLC, 247 F. Supp. 3d 571, 589 (E.D. Pa.

2017) (quoting Opsatnik v. Norfolk S. Corp., 335 F. App'x 220,

222–23 (3d Cir. 2009)).  Demonstrating that employees are

similarly situated often includes a "showing that the two

employees dealt with the same supervisor, were subject to the

same standards, and had engaged in similar conduct without such

differentiating or mitigating circumstances as would distinguish

their conduct or the employer's treatment of them."  Id. at

589-90 (quoting Opsatnik, 335 F. App'x at 223).

    With regard to Baylis, Jerome is correct that she was

previously similarly situated to Jerome.  However, Baylis

resigned her employment with PHA in December 2017, several

months before PHA investigated the vehicle pursuit at issue and

thus could not have been terminated by PHA like Jerome.  She is

not an appropriate comparator.  See, e.g., Dill v. Runyon, No.

96-3584, 1997 WL 164275, at *4 (E.D. Pa. Apr. 3, 1997).

    As for Brooks, PHA records show that, on August 16,

2016, Brooks spotted a white Ford Explorer driving recklessly on

Fairmount Avenue between 47th and 48th Streets in Philadelphia.

Brooks then

> activated her emergency lights and attempted
> to stop the vehicle.  Seconds later, the
> Explorer drove into the intersection and hit
> another vehicle.  Upon the Explorer coming
> to a stop at 48th and Brown St. the two male

> occupants exited the vehicle and ran away
> from the scene, with Officer Brooks in <u>foot
> pursuit</u>.

(emphasis added).  Thus, Brooks attempted to stop a vehicle but followed it for mere seconds and less than one city block.  She then pursued the suspect on foot.  This is not comparable conduct to Jerome, who engaged in a vehicular pursuit for several city blocks, ending in a crash which caused injuries to third parties.  Further, Brooks completed a Pursuit Memorandum about the event and did not otherwise attempt to cover up the incident as Jerome did.

While Jerome also alleges racial discrimination in his complaint, he has produced no evidence of such discrimination.  Jerome, who is African American, has not pointed to any PHA-PD officers who are of a different race and engaged in similar conduct but received more favorable treatment.  The two comparators he has pointed to in support of his gender discrimination claim and whom he claims engaged in similar conduct but received more favorable treatment, Baylis and Brooks, are both African American.  Defendants, meanwhile, have pointed to Jacqueline Hampshire and Christian Jablonski, two Caucasian PHA-PD officers, who engaged in a vehicular pursuit while on duty on March 9, 2016 and who were suspended and then terminated by PHA.  <u>See</u> <u>Hampshire v. Phila. Housing Auth.</u>, No. 17-4423, 2019 WL 652481, at *1-5 (E.D. Pa. Feb. 14, 2019).

Moreover, Jerome stated during his deposition in this matter that he is not claiming discrimination on the basis of race.

Even assuming that Jerome had satisfied his prima facie case, defendants have pointed to a legitimate, nondiscriminatory reason for his terminations. No reasonable factfinder could conclude that Jerome was terminated for any reason other than his violation of PHA policies, most importantly Directive 41 which prohibited officers from engaging in vehicular pursuits. There is no genuine dispute that Jerome engaged in the pursuit and that such conduct was in violation of Directive 41.[4] Jerome has referred to the incident as a pursuit and has admitted that he and Baylis followed the Cherokee with the siren and lights of their patrol vehicle activated. Simply put, Jerome has failed to produce any evidence to create a genuine dispute of material fact regarding whether the reasons offered by PHA for his termination were pretextual.

---

4. Jerome erroneously asserts that Directive 41 is inapplicable because it has been "superseded" by state law, citing section 6342(f) of the Pennsylvania Motor Vehicle Code. That section provides "[n]o police departmental policy may violate or supersede the requirements of section 3105 (relating to drivers of emergency vehicles)." 75 Pa. Cons. Stat. Ann. § 6342(f). Section 3105 outlines the special privileges afforded to the operators of emergency vehicles, such as the ability to proceed past red lights and to exceed speed limits. 75 Pa. Cons. Stat. Ann. § 3105. It does not address the circumstances under which an officer such as Jerome can initiate a vehicular pursuit and does not conflict with Directive 41.

Accordingly, the court will grant the motion of defendants for summary judgment as to Jerome's claims for gender and racial discrimination under Title VII, the PHRA, and the Philadelphia Fair Practices Ordinance in Counts II, VI, and VII of the complaint.

IV

Jerome has also claimed in Counts II and VI that he was subjected to a hostile work environment while employed by PHA in violation of Title VII and the PHRA. To proceed with his claim of hostile work environment, Jerome must come forward with evidence that: (1) he suffered intentional discrimination because of his race and/or gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of respondeat superior liability. Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017) (citing Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)).

Jerome has not met his burden to establish a prima facie case of hostile work environment because he has not produced evidence to support the second element, that is, that he suffered discrimination that was severe or pervasive. To show severe or pervasive discrimination, Jerome must produce evidence that the environment at PHA was "permeated with

-18-

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." Culler v. Sec'y of U.S. Veterans Affairs, 507 F. App'x 246, 249 (3d Cir. 2012) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002)).

In support of his hostile work environment claim, Jerome alleges that he was "threatened in rollcall" by Lieutenant Dunbar. Jerome did not provide any details regarding the substance or timing of this interaction and has not pointed to any other instances of hostile treatment during his employment. This one vague interaction is insufficient to create a genuine dispute of material fact and thus we will grant defendants' summary judgment motion with respect to Jerome's hostile work environment claim.[5]

V

We turn next to Jerome's claim of retaliation in violation of Title VII in Count I of the complaint. To state a prima facie case of retaliation, Jerome must demonstrate that: (1) he engaged in a protected activity; (2) defendants took adverse action against him; and (3) there was a causal link

---

5. To the extent Jerome cites his suspension and termination as evidence of hostile work environment, he conflates such claim with his disparate treatment discrimination claim, which fails for the reasons discussed above. See Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 281 n.11 (3d Cir. 2001).

-19-

between the protected activity and the adverse action. <u>Abramson v. William Paterson Coll. of N.J.</u>, 260 F.3d 265, 286 (3d Cir. 2001). A causal connection may be shown by "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action" or "a pattern of antagonism coupled with timing to establish a causal link." <u>Gera v. Cnty. of Schuylkill</u>, 617 F. App'x 144, 147 (3d Cir. 2015). If Jerome articulates his prima facie case, the burden shifts to defendants to articulate a legitimate, non-discriminatory reason for its conduct. <u>See</u> <u>Carvalho-Grevious v. Del. State Univ.</u>, 851 F.3d 249, 257 (3d Cir. 2017).

Jerome's retaliation claim fails because he did not engage in protected activity that was casually connected to his suspension and termination. The undisputed facts presented here show that PHA-PD Deputy Chief Eberhart requested that Jerome be suspended for ten days with a recommendation for discharge on September 19, 2018. While the request was pending, Jerome was placed on restricted duty on September 22, 2018. Jerome thereafter, on September 27, 2018, submitted to the President and Chief Executive Officer of PHA and defendant Marker a "Notification" memorandum stating in part:

> 3. A Charge of Employment Discrimination is made, because of race, gender, hostile work environment, and retaliation for aiding in or participating in a complaint of employment discrimination.

-20-

4. An EEOC, Phila. Office, Form 5 Charge for
employment discrimination, because of
race, gender, a hostile work environment,
and retaliation is in process. Respondent
includes but is not limited to PHA and
supervisor and management of PHA and
PHAPD.

5. Witness status and providing truthful
sworn testimony in a federal
discrimination lawsuit involving PHA and
former PHA police chief Bard and VP
Director of Human Resource J. Strauss is
disclosed. Disclosure as to the assigned
trial judge and PHA, Bard and Strauss
through PHA's counsel in the
discrimination lawsuit.

At the time of this "Notification," Jerome had already been

placed on restricted duty and notified that he would be

suspended with a recommendation for discharge based on his

violations of the PHA disciplinary code and PHA policy,

including Directive 41 prohibiting vehicular pursuits. He had

not filed any charge of discrimination with the EEOC. While the

"Notification" appears to suggest that Jerome intended to act as

a witness in an employment discrimination action brought against

PHA by two former PHA employees who were also represented by

Jerome's counsel, Jerome had not been identified on a witness

list nor actually submitted an affidavit or other sworn

testimony in that action before he was notified of his impending

suspension with the recommendation for discharge.[6] Although Jerome claims he was going to support those plaintiffs in their suit against PHA, he was not employed by PHA during the same period as those plaintiffs, has never spoken to them, and thus has no first-hand knowledge of the circumstances surrounding their employment and discharge.

Furthermore, Jerome's claim for retaliation fails because defendants have articulated a legitimate, nondiscriminatory reason for his discharge. As stated above, Jerome was terminated for his violations of the PHA disciplinary code and PHA policy, including Directive 41 prohibiting vehicular pursuits. There can be no dispute that Jerome did, in fact, engage in such pursuit and that he failed to complete the required paperwork, in violation of Directive 41. Jerome's attempt to escape the consequences of his actions by submitting the "Notification" after he had already been investigated and placed on restricted duty with notice of his impending suspension with a recommendation for discharge cannot raise a genuine issue of material fact as to whether PHA's reason for

---

6.  Jerome has submitted a declaration in which he asserts that sometime in July 2018 he came forward to his union and to counsel for plaintiffs in the Hampshire matter, who now represents Jerome in this action. However, Jerome has produced no evidence that the relevant decisionmakers at PHA were aware of his interaction with the union and plaintiffs' counsel.

the discharge was pretextual or was more likely than not

retaliatory.[7]  See Fuentes, 32 F.3d at 763.

Accordingly, the motion of defendants for summary

judgment will be granted as to Jerome's claim in Count I of the

complaint for retaliation in violation of Title VII.

VI

In Count III of the complaint, Jerome contends that

defendants deprived him of his right under the Fourteenth

Amendment to the United States Constitution to procedural due

process in violation of 42 U.S.C. §§ 1981 and 1983.  The

Fourteenth Amendment provides in relevant part:

> No State shall make or enforce any law which
> shall abridge the privileges or immunities
> of citizens of the United States; nor shall
> any State deprive any person of life,
> liberty, or property, without due process of
> law; nor deny to any person within its
> jurisdiction the equal protection of the
> laws.

U.S. Const. amend. XIV, § 1.  To state a claim for deprivation

of procedural due process, a plaintiff must allege that:

"(1) he was deprived of an individual interest that is

encompassed within the Fourteenth Amendment's protection of

'life, liberty, or property'[;] and (2) the procedures available

---

7.  To the extent Jerome contends that his retaliation claim
should survive because his termination may have been based on
"mixed motives," such theory is inapplicable to retaliation
claims.  See, e.g., Egan v. Del. River Port Auth., 851 F.3d 263,
273 (3d Cir. 2017).

to him did not provide 'due process of law.'" Hill v. Borough of Kutztown, 455 F.3d 225, 234 (3d Cir. 2006) (citing Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)). Here, there is no dispute that Jerome was a public employee with a property interest in his employment.

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 542 (1985) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)). The Supreme Court has instructed that due process requires a "pretermination opportunity to respond, coupled with post-termination administrative procedures." Id. at 547-48. The pretermination hearing "need not be elaborate." Id. at 545. Instead,

> [t]he tenured public employee is entitled to
> oral or written notice of the charges
> against him, an explanation of the
> employer's evidence, and an opportunity to
> present his side of the story. To require
> more than this prior to termination would
> intrude to an unwarranted extent on the
> government's interest in quickly removing an
> unsatisfactory employee.

Id. at 546 (internal citations omitted).

The undisputed evidence presented here shows that, on September 22, 2018, Jerome attended a meeting with Lieutenant Dunbar and his union representative at which Jerome was

-24-

presented with a "Notification of Restricted Duty and Pending Disciplinary Action."  The notice cited the specific policies that Jerome was alleged to have violated.  Jerome was provided an opportunity to speak but declined to do so.  Jerome signed the Notification to acknowledge his receipt.  The Notification was the result of a thorough investigation by the PHA-OAC during which Jerome and others were interviewed.

Thereafter, on September 28, 2018, Jerome attended a second meeting at which he was presented with a "Notice of Suspension" in the presence of his union representative.  That Notice again laid out the specific policy violations allegedly committed by Jerome as well as the factual basis for the discipline.  The Notice was read to Jerome and he was provided an opportunity to speak but declined to do so.

Jerome's union then filed a grievance regarding his suspensions.  A grievance hearing was held on October 11, 2018. Jerome attended the hearing but did not speak on the advice of his union representative.  After reviewing the evidence, the grievance officer upheld PHA's decision to discipline Jerome. Jerome's termination did not become effective until after the grievance procedure was completed, on October 31, 2018.  The union has filed a request for arbitration, which has been scheduled for February 4, 2020.

Thus, the undisputed record demonstrates that Jerome was provided with written and oral notice of the charges against him and PHA's intent to discipline him. He was also given an opportunity to respond, which he declined. The fact that Jerome chose not to speak or ask questions at certain junctures of this process does not mean that he was deprived of the opportunity to respond. See Gniotek v. City of Phila., 808 F.2d 241, 245 (3d Cir. 1986).

The CBA entered into by PHA and Jerome's union provides that an employee shall be provided with written notice of intended discipline, including the offense alleged, the type and duration of the discipline, and the intended effective date of the discipline. In situations where the intended discipline is discharge, the employee shall receive a ten-day suspension with notice of the intent to discharge. The employee has an opportunity to file a grievance and have a hearing. The discharge does not become effective until the grievance procedure is completed or the parties otherwise resolve the matter. As outlined above, there can be no dispute that defendants followed the disciplinary process outlined in this agreement. The process outlined in the CBA provided adequate opportunity for Jerome to challenge his proposed termination and to obtain meaningful review prior to his termination and thus satisfies the due process clause. See Dykes v. Se. Pa. Transp.

Auth., 68 F.3d 1564, 1565, 1571-72 (3d Cir. 1995); Ruff v. Long,
111 F. Supp. 3d 639, 648 (E.D. Pa. 2015).

Based on the record before the court, there can be no
dispute that Jerome received sufficient due process.
Accordingly, we will grant defendants' motion for summary
judgment as to Count III of the complaint.[8]

VII

In Count IV of the complaint, Jerome asserts that
defendants retaliated against him for exercising his rights to
free speech and free association in violation of the First and
Fourteenth Amendments to the United States Constitution.  The
First Amendment provides: "Congress shall make no law . . .
abridging the freedom of speech."  U.S. Const. amend. I.  Public
employees such as Jerome are entitled to exercise their rights
under the First Amendment without fear of retaliation by their
employer.  See Brennan v. Norton, 350 F.3d 399, 412 (3d Cir.
2003).  To defeat summary judgment on this claim, Jerome must
come forward with evidence that:  (1) he engaged in conduct
protected under the First Amendment; (2) PHA retaliated against
him; and (3) that a causal connection exists between the

_____

8.  To the extent that Jerome asserts any violation of his
substantive due process or equal protection rights on the basis
of race and/or gender, those claims fail for the reasons
discussed above.

protected conduct and the retaliatory action.[9]  Thomas v.
Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006); see also
Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005).

        In support of this claim, Jerome maintains that PHA
violated his constitutional rights and retaliated against him
for coming forward as a witness in Hampshire v. Philadelphia
Housing Authority, a matter previously pending in this court.[10]
See No. 17-4423 (E.D. Pa.).  However, Jerome's claims fail
because he has not produced evidence that defendants retaliated
against him because of his alleged status as a witness in
Hampshire or otherwise interfered with his ability to provide
testimony in that action.  As discussed above, Jerome submitted
his "Notification" memorandum to Eberhart on September 27, 2018.
In it, he stated that he had "[w]itness status and [was]
providing truthful sworn testimony in a federal discrimination
lawsuit involving PHA."  This was well after the conclusion of
the OAC investigation regarding his conduct and after he had
already been notified that PHA was suspending him with the

---

9. To the extent Jerome premises this claim on violation of the
Fourteenth Amendment, it is "functionally equivalent" to our
First Amendment analysis.  See Hill, 411 F.3d at 125-26.

10.  On February 14, 2019, this court entered summary judgment
in favor of defendants on the employment discrimination and
other claims of plaintiffs Jacqueline Hampshire and Christian
Jablonski, two former employees of PHA-PD.  On November 25,
2019, our Court of Appeals affirmed this judgment.  See
Hampshire v. Bard, No. 19-1565, 2019 WL 6273432 (3d Cir. Nov.
25, 2019).

intent to discharge him.  There can be no dispute that Jerome was terminated not because of his intent to aid the plaintiffs in <u>Hampshire</u> but instead due to his violations of PHA disciplinary code and policy, including Directive 41.

Accordingly, the motion of defendants for summary judgment on Count IV of the complaint will be granted.[11]

---

11.  In opposition to defendants' motion for summary judgment, Jerome has requested leave to amend his complaint to name Eberhart as a defendant.  Defendants identified Eberhart as an individual who possessed knowledge about this action in their initial disclosures served on May 29, 2019 and thus plaintiff's request after a summary judgment motion has been filed is untimely.  Regardless, because we are granting defendants' motion for summary judgment, we will deny plaintiff's motion to amend.